UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                          v.                                :
                                                            :
ALAN KAUFMAN,                                               :        No. 19 Cr. 504 (LAK)
and TONY GEORGITON,                                         :
                                                            :
                                                            :
                                    Defendants.             :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT TONY GEORGITON'S PRETRIAL MOTIONS**


KRIEGER KIM & LEWIN LLP
500 Fifth Avenue
34th Floor
New York, New York 10110
Tel.: (212) 390-9550

AIDALA, BERTUNA & KAMINS
546 5th Avenue
New York, New York 10036
Tel.: (212) 486-0011

*Attorneys for Tony Georgiton*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................ 3

   I.    THE INDICTMENT .................................................................................................. 3

   II.   THE NCUA INVESTIGATION & NOTICE OF CHARGES ........................................... 6

ARGUMENT ..................................................................................................................... 7

   I.    THE COURT SHOULD ALLOW MR. GEORGITON TO JOIN CERTAIN OF
MR. KAUFMAN'S MOTIONS .......................................................................................... 7

   II.   MR. GEORGITON'S TRIAL SHOULD BE SEVERED FROM THE TRIAL OF MR.
KAUFMAN ....................................................................................................................... 8

       A.    Legal Standard ................................................................................................. 8

       B.    Mr. Georgiton Would Face Substantial Spillover Prejudice at a Joint Trial ............... 9

       C.    Mr. Georgiton Would Face Further Spillover Prejudice from Evidence of Mr.
Kaufman's Uncharged Acts .................................................................................. 12

       D.    Limiting Instructions Would Not Suffice to Cure the Spillover Prejudice ............... 14

       E.    Alternatively, the Court Should Sever Counts One through Three from Count Four 14

   III.  THE GOVERNMENT MUST SEARCH FOR, IDENTIFY, AND PRODUCE RULE 16
AND *BRADY* MATERIALS IN THE NCUA'S FILES .......................................................... 15

       A.    Legal Standard ............................................................................................... 16

       B.    The USAO and NCUA Conducted a Joint Investigation ........................................ 18

   IV.  THE COURT SHOULD DIRECT THE GOVERNMENT TO FILE A BILL OF
PARTICULARS ................................................................................................................ 20

       A.    Legal Standard ............................................................................................... 21

       B.    A Bill of Particulars is Required for Mr. Georgiton to Adequately Prepare His
Defense and Avoid Surprise at Trial ...................................................................... 22

   V.   THE COURT SHOULD PERMIT MR. GEORGITON TO FILE ADDITIONAL
MOTIONS ...................................................................................................................... 24

CONCLUSION ................................................................................................................. 24

# **TABLE OF AUTHORITIES**

## **Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. *passim*

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................ 15

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................................ 16

*United States v. Abrams*, 539 F. Supp. 378 (S.D.N.Y. 1982) ....................................... 10

*United States v. Barret*, 824 F. Supp. 2d 419 (E.D.N.Y. 2011) ...................................... 9

*United States v. Basciano*, No. 05 Cr. 060 (NGG), 2007 WL 3124622
(E.D.N.Y. Oct. 23, 2007) ........................................................................................ 14

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................. 21

*United States v. Blount*, 291 F.3d 201 (2d Cir. 2002) .................................................. 8

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ........................................... 21

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989) ............................................... 17

*United States v. Butler*, No. 104 Cr. 340 (GEL), 2004 WL 2274751 (S.D.N.Y. Oct. 7, 2004) ... 12

*United States v. Carrasco*, 968 F. Supp. 948 (S.D.N.Y. 1997) ..................................... 10

*United States v. Carson*, 702 F.2d 351 (2d Cir. 1983) ................................................. 9

*United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 945934
(S.D.N.Y. Mar. 2, 2017) ................................................................................... 16, 17

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ............................................. 21

*United States v. Feyrer*, 333 F.3d 110 (2d Cir. 2003) .................................................. 8

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) .............................................. 13

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) ................................. 17

*United States v. Gardell*, No. 400 Cr. 632 (WHP), 2001 WL 1135948
(S.D.N.Y. Sept. 25, 2001) ..................................................................................... 13

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ................................................. 13

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ......................... 16, 17, 19

*United States v. Hameedi*, No. 17 Cr. 137 (JGK), 2017 WL 5152991
(S.D.N.Y. Nov. 3, 2017) ........................................................................................ 11

*United States v. Harding*, 273 F. Supp. 2d 411 (S.D.N.Y. 2003) ................................. 21

*United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ............. 10

*United States v. Loera*, No. 09 Cr. 466 (BMC), 2017 WL 2821546 (E.D.N.Y. June 29, 2017).. 16

*United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ........................................ 18, 19

*United States v. McDermott*, 245 F.3d 133 (2d. Cir. 2001)........................................ 14

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................ 21

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) ........................... 13

*United States v. Rajaratnam*, 753 F. Supp. 2d 299 (S.D.N.Y. 2010) ........................... 14

*United States v. Raniere*, 384 F. Supp. 3d 282 (E.D.N.Y. 2019) ................................. 16

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ................................................... 21

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) ............................................ 16

*United States v. Rodriguez*, 734 F. Supp. 116 (S.D.N.Y. 1990) .................................. 14

*United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004) .............................................. 15

*United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533

(S.D.N.Y. Mar. 7, 2001) ............................................................................................ 21, 23

*United States v. Shakur*, 543 F. Supp. 1059 (S.D.N.Y. 1982) ..................................... 17

*United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) ................................................... 9

*United States v. Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) .................................. 10, 17

*Zafiro v. United States*, 506 U.S. 534 (1993)................................................................. 8

## Statutes

18 U.S.C. § 215 ........................................................................................................ *passim*

18 U.S.C. § 371 ....................................................................................................... 1, 4

Federal Rule of Criminal Procedure 7 ............................................................. 1, 3, 21

Federal Rule of Criminal Procedure 8 .................................................................. 8, 15

Federal Rule of Criminal Procedure 14 ................................................................ *passim*

Federal Rule of Criminal Procedure 16 ................................................................ *passim*

Federal Rule of Evidence 404(b)……………………………………………………………*passim*

## Treatise

Charles Alan Wright et al., Federal Practice and Procedure § 130 (4th ed. 2019)………...........21

## PRELIMINARY STATEMENT

This memorandum of law is respectfully submitted in support of defendant Tony Georgiton's motions to: (1) join co-defendant Alan Kaufman's motions to dismiss Count One of the Indictment and for a bill of particulars, as well as dismiss Count Three of the Indictment for the reasons substantially set forth in Mr. Kaufman's moving papers; (2) sever Mr. Georgiton's trial from Mr. Kaufman's trial, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, because a joint trial would result in substantial spillover prejudice to Mr. Georgiton; (3) order the government to search for, identify, and produce materials in the files of the National Credit Union Administration ("NCUA"), pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny; (4) order the government to file a bill of particulars, pursuant to Rule 7 of the Federal Rules of Criminal Procedure; and (5) permit Mr. Georgiton to file additional motions, given the volume and timing of discovery produced to date by the government.

The Indictment charges Mr. Georgiton in two counts with: (1) conspiracy to commit bribery under 18 U.S.C. § 371 (Count One); and (2) substantive bribery under 18 U.S.C. § 215 (Count Three).  These charges arise from allegations that Mr. Georgiton provided rent-free housing to Mr. Kaufman, in exchange for which Mr. Kaufman, the Chief Executive Officer of Melrose Credit Union ("Melrose"), (a) approved Melrose loans on favorable terms to companies owned by Mr. Georgiton, and (b) obtained approval from the Melrose Board of Directors to purchase the naming rights to a ballroom in Astoria, Queens owned by a company owned by Mr. Georgiton.  Mr. Kaufman, who is charged in the Count One conspiracy along with Mr. Georgiton, is also charged in Count Two with substantive bribery under 18 U.S.C. § 215 relating to the same factual allegations.

1

In addition to these three counts, the Indictment alleges an entirely separate and distinct scheme (the "Second Bribery Scheme"), premised on allegations that Mr. Kaufman solicited and accepted tens of thousands of dollars of lavish gifts, including expensive vacations for himself and his girlfriend, from a media company, in exchange for which Mr. Kaufman approved increased Melrose advertising spending with the media company.  This alleged scheme, for which Mr. Kaufman is charged with a second substantive count of bribery in Count Four, bears no relation whatsoever to Mr. Georgiton.

A joint trial of Mr. Georgiton and Mr. Kaufman would result in significant and incurable spillover prejudice to Mr. Georgiton due to the admission of evidence relating to the Second Bribery Scheme, which would be inadmissible in a trial against Mr. Georgiton alone.  This is especially so given the inflammatory nature of that evidence – including evidence of luxury hotel stays, spa treatments, and golf outings accepted in exchange for the credit union's advertising money.  Moreover, the risk of spillover prejudice is considerably amplified in light of the multiple uncharged bad acts by Mr. Kaufman outlined in the publicly-available NCUA Notice of Charges against Mr. Kaufman, *see* NCUA Notice of Charges, Notice of Assessment of Civil Money Penalty, and Notice of Hearing, Exhibit C, which the government may well seek to admit against Mr. Kaufman under Federal Rule of Evidence 404(b).  These acts, too, have zero connection to Mr. Georgiton or his alleged conduct.  Accordingly, as discussed below, the Court should grant Mr. Georgiton a severance from Mr. Kaufman.  In the absence of a severance, there is a serious risk that the jury – presented with extensive and inflammatory evidence wholly unrelated to Mr. Georgiton – will be unable to make a reliable determination as to his innocence.

Further, the Indictment and the discovery produced to date make abundantly clear that the United States Attorney's Office's ("USAO's") investigation of this matter has been conducted

jointly with the NCUA and, indeed, that the NCUA has taken the laboring oar with regard to the significant fact-finding in this investigation.  The government's document productions contain nearly 150,000 documents (after de-duplication by defense counsel) compiled by the NCUA.  In fact, documents from the NCUA compose the majority of the discovery produced to date.  Further, to the extent that the USAO has responded to questions from counsel for Mr. Georgiton pertaining to both the documents produced and deficiencies in the government's productions, the USAO has relied on the NCUA for the relevant information.  Under these circumstances, the Court should issue an Order directing the USAO to affirmatively search for, identify, and produce materials in the NCUA's files to which Mr. Georgiton is entitled under Rule 16 and *Brady*.

Finally, the Indictment and the discovery in this case fail to provide critical, basic information about the pending charges; including, by way of two key examples, which loans were issued or refinanced on allegedly favorable terms, and what company owned by Mr. Georgiton was allegedly the borrower for such loans.  Without such information about the essential facts underlying the allegations in the Indictment, Mr. Georgiton cannot adequately prepare his defense and is at risk of unfair surprise at trial.  Accordingly, pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, the Court should direct the government to file a bill of particulars.

## **BACKGROUND**

### I.   **THE INDICTMENT**

On July 11, 2019, an indictment was unsealed against Mr. Georgiton and Mr. Kaufman. The Indictment alleges two distinct bribery schemes – only one of which involves Mr. Georgiton – arising out of two separate sets of facts.

3

A.      **The First Bribery Scheme**

The first charged scheme – labeled in the Indictment as the "First Bribery Scheme," Ind. at 3 – pertains to allegations that, in November 2010, Mr. Georgiton purchased a house in Jericho, New York (the "Jericho Residence"), and permitted Mr. Kaufman to live in that house for a two-year period without paying rent. Ind. ¶ 8. In 2011 and 2012, while Mr. Kaufman was living in the Jericho Residence – and purportedly in exchange for the rent-free housing as well as unspecified "other things of value," *id.* ¶ 7 – Mr. Kaufman approved loans and the refinancing of pre-existing loans to "a company owned by" Mr. Georgiton on what the government alleges were "favorable" terms. *Id.* ¶¶ 9–11. Moreover, in September 2011, Mr. Kaufman presented to Melrose's Board of Directors (the "Board"), for its approval, a proposal to purchase naming rights for a ballroom in Astoria, Queens, which was "owned by a company owned by" Mr. Georgiton. *Id.* ¶ 12. After the Board approved the proposal, Melrose paid approximately $2 million for the naming rights. *Id.* ¶ 15. Ultimately, in February 2013, Mr. Kaufman purchased the Jericho Residence from Mr. Georgiton, using in part a personal loan from Mr. Georgiton that Mr. Kaufman has not repaid to date. *Id.* ¶ 16. The Indictment alleges that Mr. Kaufman did not disclose to the Board that he had lived in the Jericho Residence without paying rent nor that Mr. Georgiton had assisted him in ultimately purchasing the home. *Id.* ¶ 17.

In connection with this alleged scheme, (1) Mr. Georgiton and Mr. Kaufman are charged with conspiracy to commit bribery under 18 U.S.C. § 371 in Count One; (2) Mr. Kaufman is charged with substantive bribery under 18 U.S.C. § 215 in Count Two; and (3) Mr. Georgiton is charged with substantive bribery under 18 U.S.C. § 215 in Count Three.

B.    **The Second Bribery Scheme**

The Indictment also alleges an entirely separate scheme – which it labels the "Second Bribery Scheme," *id.* at 11 – that is wholly unconnected to Mr. Georgiton.  This charged scheme pertains to allegations that, from 2010 through 2015, Mr. Kaufman solicited and accepted free trips and other gifts worth tens of thousands of dollars from a media company (the "Media Company").  *Id.* ¶ 26.  According to the Indictment, these free trips were to "vacation destinations."  *Id.*  They included, for instance, (a) a trip to Paris in 2010, including accommodations at the Four Seasons George V Paris and activities such as golfing; (b) a trip to Hawaii in 2012, including accommodations at the Four Seasons in Wailea and activities such as golfing and spa treatments; and (c) a trip to attend the Super Bowl in New Orleans in 2013, including accommodations, flights, and tickets to the game.  *Id.* ¶ 27.  Mr. Kaufman's girlfriend, who also worked at Melrose, accompanied him on each such trip.  *Id.* ¶¶ 26–27.  In exchange for these free trips, Mr. Kaufman was allegedly required to increase incrementally Melrose advertising spending with the Media Company, as emails quoted in the Indictment purport to show.  *Id.* ¶ 28.

The Indictment further alleges that in connection with the Second Bribery Scheme Mr. Kaufman received additional free trips from other Melrose vendors.  *Id.* ¶ 29.  For instance, another media company with which Melrose spent advertising money allegedly paid for Mr. Kaufman and his girlfriend to travel to Sweden to attend a hockey game in 2011.  *Id.*  And, in 2014, a professional sports company with which Melrose spent advertising money (the "Sports Company") allegedly paid for Mr. Kaufman to attend a football game in San Diego.  *Id.* Similarly, in 2015, the Sports Company allegedly paid for Mr. Kaufman to attend the National Football League draft in Chicago.  *Id.*

According to the Indictment, Mr. Kaufman did not seek Board approval for these vendor-paid trips, nor did he disclose them.  *Id.* ¶ 30.

In connection with the Second Bribery Scheme, which Mr. Georgiton is not alleged to have had any involvement in or even knowledge of, Mr. Kaufman is charged in Count Four with a separate count of substantive bribery under 18 U.S.C. § 215.

## II.    THE NCUA INVESTIGATION & NOTICE OF CHARGES

Prior to the initiation of the instant criminal case, the NCUA began an investigation into Melrose, including but not limited to the specific misconduct alleged against Mr. Kaufman and Mr. Georgiton in the Indictment.  Indeed, the majority of the voluminous discovery materials produced by the government to date – nearly 150,000 documents (after de-duplication by defense counsel) – were gathered through the NCUA's fact-finding efforts.

As part of its investigation, in August 2018, the NCUA publicly filed a Notice of Charges against Mr. Kaufman, alleging that Mr. Kaufman, in various ways, violated statutory and regulatory restrictions, breached his duties to Melrose, and violated Melrose policies.  *See* Ex. C. Of the seven counts in the Notice of Charges, only three touch upon Mr. Georgiton.  Counts Two through Four mirror the First Bribery Scheme alleged in the Indictment against Mr. Kaufman and Mr. Georgiton, *see* Ex. C ¶¶ 26–66; Ind. ¶¶ 7–25; and Count One mirrors the Second Bribery Scheme alleged in the Indictment against Mr. Kaufman, *see* Ex. C ¶¶ 19–25; Ind. ¶¶ 26–32.

The remaining counts in the Notice of Charges, however, allege numerous other bad acts by Mr. Kaufman that are not charged in the Indictment.  Specifically, (a) Count Five of the Notice of Charges alleges that Mr. Kaufman formed and received profits from an entity called Briarwood Transfer Services, LLC, which – unbeknownst to the Melrose Board – was operating in Melrose office space and run by employees being paid by Melrose, *see* Ex. C ¶¶ 67–75;

(b) Count Six alleges that Mr. Kaufman improperly maintained a lucrative Melrose consulting contract with his father and that he further caused Melrose to pay for expenses incurred by his father – related to Board meeting trips, conferences, and even personal vacations – not covered under the terms of that contract, *see id.* ¶¶ 67–88; and (c) Count Seven alleges that Mr. Kaufman improperly used Melrose funds to pay for personal use of a car service for himself and his family, *see id.* ¶¶ 89–94.  Like the Second Bribery Scheme charged in the Indictment, these uncharged bad acts have no connection to Mr. Georgiton.

## ARGUMENT

### I.    THE COURT SHOULD ALLOW MR. GEORGITON TO JOIN CERTAIN OF MR. KAUFMAN'S MOTIONS

Mr. Georgiton respectfully requests to join Mr. Kaufman's motion to dismiss Count One of the Indictment for the reasons set forth in Mr. Kaufman's moving papers.  In addition, because the arguments set forth by Mr. Kaufman as to the deficiencies in the Indictment and lack of venue apply with equal force to Count Three, charging Mr. Georgiton with substantive bribery under 18 U.S.C. § 215, Mr. Georgiton submits that Count Three should also be dismissed on the same bases.  More specifically, and as set forth in Mr. Kaufman's brief with regard to Mr. Kaufman, the Indictment fails to sufficiently allege that Mr. Georgiton: (i) offered Mr. Kaufman something of value; (ii) intended to influence Mr. Kaufman "in connection with" Melrose's business or transactions; or (iii) acted with the requisite corrupt intent.

Further, in addition to Mr. Georgiton's own motion for a bill of particulars pertaining to certain essential information concerning the charges in the Indictment, as discussed below, Mr. Georgiton respectfully requests to join Mr. Kaufman's motion for a bill of particulars.

## II.   MR. GEORGITON'S TRIAL SHOULD BE SEVERED FROM THE TRIAL OF MR. KAUFMAN

For the reasons set forth below, if the Court does not dismiss the Indictment, then the Court should sever Mr. Georgiton's trial from Mr. Kaufman's.  A joint trial would pose a significant risk of serious and uncurable spillover prejudice due to the introduction of evidence related to the Second Bribery Scheme and other alleged bad acts by Mr. Kaufman, none of which would be admissible against Mr. Georgiton alone.

### A.   Legal Standard

Federal Rule of Criminal Procedure 8(b) provides that defendants may be joined "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Nonetheless, even where joinder of defendants is technically proper, Federal Rule of Criminal Procedure 14 provides that if joinder "appears to prejudice a defendant," then "the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Notwithstanding the general "preference in the federal system for joint trials of defendants who are indicted together," *United States v. Blount*, 291 F.3d 201, 208–09 (2d Cir. 2002) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)), severance under Rule 14 is appropriate where "there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence," *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *Zafiro*, 506 U.S. at 539).  The Supreme Court has recognized the potential for such risk where evidence "that would not be admissible if a defendant were tried alone is admitted against a codefendant" and "erroneously could lead a jury to conclude that a defendant was guilty." *Zafiro*, 506 U.S. at 539.  Similarly, the Second Circuit has stated that,

8

while "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance," *United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)), there are "of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice," *id.* at 55; *see United States v. Barret*, 824 F. Supp. 2d 419, 433–34 (E.D.N.Y. 2011) (recognizing "that there are some instances in which severance is necessary because the volume of irrelevant evidence to be adduced at trial against one defendant is grossly disproportional to that of his or her co-defendants").

### B.    Mr. Georgiton Would Face Substantial Spillover Prejudice at a Joint Trial

Here, the sheer volume of evidence regarding alleged wrongdoing by Mr. Kaufman, entirely unconnected to Mr. Georgiton, would result in severe prejudice to Mr. Georgiton at a joint trial.

There is no suggestion in the Indictment that Mr. Georgiton had any involvement in, or even any awareness of, the alleged conduct that forms the basis of the Second Bribery Scheme. Accordingly, evidence of that scheme would almost certainly be inadmissible in a trial of Mr. Georgiton alone.  Such evidence, moreover, is likely to be voluminous.  The Indictment alleges that Mr. Kaufman, over a period of at least five years, solicited and accepted various different gifts – including but not limited to multiple trips and activities during those trips – from the Media Company.  *See* Ind. ¶¶ 26–27.  Indeed, the Indictment lists, merely by way of example, three such trips over a three-year period.  *See id.* ¶ 27.  Moreover, the Indictment alleges that, in exchange for these gifts, Mr. Kaufman increased Melrose's advertising spending with the Media Company "by an incremental amount over time," *id.* ¶ 28, suggesting the

potential for evidence of alleged increases on multiple occasions.  And, the Indictment points to further evidence of additional free trips that Mr. Kaufman allegedly received from an unspecified number of other Melrose vendors.  *Id.* ¶ 29.  Given this considerable volume of potential evidence admissible only against Mr. Kaufman, the risk of spillover prejudice to Mr. Georgiton is severe.  *See United States v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994) (noting "difficulties" faced by defendants "against whom only a small portion of the evidence is relevant" and granting severance where, among other things, defendants would otherwise "have to endure a trial involving many incidents of misconduct which do not involve them").

Further, the Indictment and discovery indicate that the type and strength of the evidence as to the Second Bribery Scheme differs significantly from that pertaining to the First Bribery Scheme in which Mr. Georgiton is alleged to have been involved.  In particular, with regard to the Second Bribery Scheme, the Indictment cites emails between Mr. Kaufman and the Media Company that purportedly show an explicit *quid pro quo*, with overt discussion of the amount of advertising spending necessary for Mr. Kaufman to qualify for free trips.  *See* Ind. ¶ 28.  In contrast, the Indictment points to no such evidence of a *quid pro quo* as to the First Bribery Scheme pertaining to Mr. Georgiton.  *See United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356, at *23 (S.D.N.Y. Jan. 2, 2001) (stating that "[f]actors that a district court should consider in deciding a motion for severance include . . . disparities in the amount or type of proof offered against the defendants"); *United States v. Abrams*, 539 F. Supp. 378, 381 (S.D.N.Y. 1982) (stating that courts should consider, in evaluating severance motions, "disparities in the quantum of proof offered against the various defendants"); *see also United States v. Carrasco*, 968 F. Supp. 948, 952 (S.D.N.Y. 1997) (granting defendant's motion to sever based on, among other things, "the mountain of evidence against his co-defendants" and "the paucity of evidence

against him"). Indeed, the charges against Mr. Georgiton conspicuously lack any support for the bald allegation that Mr. Georgiton provided the purportedly "free" housing – and we will vigorously contest that such housing was "free" – *in exchange for* "favorable" loans. In a similar vein, the Government's sole allegation that the loans at issue were "favorable" is a single vague and conclusory "state[ment]" by an unidentified Melrose loan supervisor that the interest rates on the loans were "too favorable." Ind. ¶ 11. It is entirely unclear to whom, how, or when such statement was made, and it is also uncertain what "too favorable" means in this context.

Beyond the quantity and quality of the potential evidence of Mr. Kaufman's alleged conduct in connection with the Second Bribery Scheme, Mr. Georgiton faces significant spillover prejudice from the inflammatory and sensational nature of some of that evidence. *See United States v. Hameedi*, No. 17 Cr. 137 (JGK), 2017 WL 5152991, at *5 (S.D.N.Y. Nov. 3, 2017) (considering whether "the nature of the evidence against one or more defendants includes inflammatory allegations that are different in kind from the type of evidence that can be admitted against other defendants"). The Indictment alleges that, in exchange for spending the credit union's advertising money, Mr. Kaufman received free "lavish vacations," Ind. ¶ 26, including trips to Paris and Hawaii, stays at expensive luxury hotels in each of those destinations, and activities including golfing and spa treatments, *id.* ¶ 27. Similarly, the Indictment alleges that Mr. Kaufman accepted free domestic and international trips to professional sporting events from Melrose vendors. *Id.* ¶ 29. Potentially sensational evidence of these pricey, luxurious gifts allegedly and improperly sought and accepted by Mr. Kaufman will exacerbate the risk of spillover prejudice to Mr. Georgiton.

At the same time, though the two schemes alleged in the Indictment are distinct, there are also similarities that create significant potential for juror confusion, heightening the risk that a

11

jury would not be able to make a reliable judgment as to Mr. Georgiton's innocence based solely on the charges that implicate him.  *See United States v. Butler*, No. 104 Cr. 340 (GEL), 2004 WL 2274751, at *6 (S.D.N.Y. Oct. 7, 2004) (considering in evaluating severance motion the extent to which the charged crimes "involv[e] separate actions by different defendants acting in different ways" such that they "would be relatively easy for a properly-instructed jury to keep separate"). The charges arising out of the First Bribery Scheme and the Second Bribery Scheme – though premised on entirely different sets of facts and supporting evidence – both allege, broadly, that Mr. Kaufman personally accepted items of value and, in exchange, used his position at Melrose to confer business benefits.  There is a substantial likelihood that the jury will erroneously conflate, for example, any evidence of an explicit *quid pro quo* as to the Second Bribery Scheme with the bribery allegations involving Mr. Georgiton in the First Bribery Scheme.  More specifically, the jury may erroneously conclude that Mr. Georgiton had a corrupt mental state based solely on the extensive allegations that Mr. Kaufman had such a corrupt mental state, not only with respect to the First Bribery Scheme but also with respect to the Second Bribery Scheme and, as described below, his other alleged bad acts.

In sum, in the absence of a severance, there is a grave risk that Mr. Georgiton would face substantial spillover prejudice from the allegations against Mr. Kaufman and the potentially voluminous evidence supporting those allegations that would otherwise be inadmissible against Mr. Georgiton.

### C.    Mr. Georgiton Would Face Further Spillover Prejudice from Evidence of Mr. Kaufman's Uncharged Acts

At a joint trial, the government may seek to admit, pursuant to Federal Rule of Evidence 404(b), multiple uncharged bad acts allegedly committed by Mr. Kaufman, which are wholly

unrelated to Mr. Georgiton.  Evidence of such uncharged conduct significantly heightens the risk of incurable spillover prejudice to Mr. Georgiton.

Courts in this district have recognized the potential for spillover prejudice where prior acts evidence is admissible against only one defendant in a joint trial.  *See United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 173 (S.D.N.Y. 2006) ("The Second Circuit recognizes the potential 'spillover' prejudice that a co-defendant may incur in a joint trial where prior-act evidence is admitted against another co-defendant." (citing *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995); *United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980))); *United States v. Gardell*, No. 400 Cr. 632 (WHP), 2001 WL 1135948, at *8 (S.D.N.Y. Sept. 25, 2001) ("Plainly, the potential for unfair prejudice associated with the admission of Rule 404(b) evidence is magnified when multiple defendants are tried together.").

While the government has not yet informed the defendants of the specific Rule 404(b) evidence it plans to offer at trial, the NCUA Notice of Charges details multiple uncharged bad acts by Mr. Kaufman.  These alleged acts by Mr. Kaufman include forming and profiting from an entity that, without knowledge of or permission from the Melrose Board, used Melrose office space and employees for its operations, *see* Ex. C ¶¶ 67–75; improperly maintaining a Melrose consulting contract with his father and further causing Melrose to pay for expenses incurred by his father – including personal vacation expenses – not covered under the terms of that contract, *see id.* ¶¶ 67–88; and improperly using Melrose funds to pay for personal use of a car service for himself and his family, *see id.*  ¶¶ 89–94.  Each of these acts, if introduced by the government,

would substantially increase the mass of evidence against Mr. Kaufman that would be inadmissible in a trial of Mr. Georgiton alone.[1]

### D.   Limiting Instructions Would Not Suffice to Cure the Spillover Prejudice

Although courts in this District have recognized that, in some instances, "limiting instructions may be sufficient to address any prejudicial spillover that may result from a multi-defendant, multi-count trial," *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 317 (S.D.N.Y. 2010), that is not this case.  Rather, such instructions cannot here be presumed to be effective, given the overwhelming risk of substantial prejudice to Mr. Georgiton.  *See United States v. McDermott*, 245 F.3d 133, 139–40 (2d. Cir. 2001) (stating that where "prejudicial spillover" is "overwhelming," limiting instructions to the jury "cannot be presumed to be effective"); *United States v. Basciano*, No. 05 Cr. 060 (NGG), 2007 WL 3124622, at *3 (E.D.N.Y. Oct. 23, 2007) (same).  The only fair way to prevent such spillover prejudice is to sever Mr. Georgiton's case from Mr. Kaufman's.

### E.   Alternatively, the Court Should Sever Counts One through Three from Count Four

In the alternative, if the Court declines to sever Mr. Georgiton's trial from the trial of Mr. Kaufman, the Court should sever Counts One through Three, pertaining to the First Bribery Scheme, from Count Four, pertaining to the Second Bribery Scheme.  As discussed above, the alleged conduct by Mr. Kaufman giving rise to Count Four bears no relation whatsoever to Mr. Georgiton.  Evidence relating to that charge would thus be inadmissible in a trial against Mr. Georgiton alone.  Accordingly, while such a severance of offenses would not cure the

---

[1] To the extent that the Court is not prepared to grant severance at this juncture, Mr. Georgiton respectfully requests that the motion for severance be held in abeyance pending further development of the record in this case, and, in particular, the government's notice of the Rule 404(b) evidence it seeks to introduce.  *See, e.g.*, *United States v. Rodriguez*, 734 F. Supp. 116, 118 n.1 (S.D.N.Y. 1990).

significant spillover prejudice resulting from the admission of Rule 404(b) evidence against

Mr. Kaufman, it would at least lessen the risk that a jury would be unable to make a reliable

determination as to Mr. Georgiton's innocence.  *See* Fed. R. Crim. P 14(a) ("If the joinder of

offenses . . .  appears to prejudice a defendant . . . the court may order separate trials of counts,

sever the defendants' trials, or provide any other relief that justice requires."); *United States v.*

*Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) ("Even though distinct offenses have been properly

joined under Rule 8, the court may order separate trials or grant a severance under Rule 14 if it

appears that the defendant is prejudiced by the joinder." (internal quotation marks omitted)).

Further, while we expect the Government will argue that severing Mr. Georgiton's trial on

Counts One and Three from Mr. Kaufman's trial on Counts One and Two would result in the

expenditure of additional judicial resources because there could be two trials on the First Bribery

Scheme, merely severing Mr. Kaufman's trial on Count Four would not result in two trials

pertaining to the First Bribery Scheme.

## III.   THE GOVERNMENT MUST SEARCH FOR, IDENTIFY, AND PRODUCE RULE 16 AND *BRADY* MATERIAL IN THE NCUA'S FILES

As set forth below, the Court should issue an Order, pursuant to Rule 16 of the Federal

Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny,

including *Giglio v. United States*, 405 U.S. 150 (1972), directing the government to search for,

identify, and produce all materials in the files of the NCUA to which Mr. Georgiton is entitled.

The discovery produced by the USAO to date demonstrates that its investigation is being

conducted jointly with – and is to a notable degree dependent on – the investigative and fact-

gathering efforts of the NCUA.  Under such circumstances, the USAO must locate and produce

any Rule 16 and *Brady* materials in the NCUA's files.

A.   **Legal Standard**

Federal Rule of Criminal Procedure 16 "governs pre-trial discovery in criminal cases"
and provides, among other things, "that a defendant is entitled to obtain from the Government
documents and objects that are 'within the government's possession, custody, or control' if
'(i) the item is material to preparing the defense; (ii) the government intends to use the item in its
case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.'" *United
States v. Loera*, No. 09 Cr. 466 (BMC), 2017 WL 2821546, at *5 (E.D.N.Y. June 29, 2017)
(quoting Fed. R. Crim. P. 16(a)(1)(E)).  "*Brady* and its progeny require the Government to
disclose material information that is 'favorable to the accused, either because it is exculpatory, or
because it is impeaching,'" and to do so "in sufficient time that the defendant will have a
reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*,
496 F.3d 221, 225, 226 (2d Cir. 2007) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82
(1999)).

The government's obligations with regard to Rule 16 and *Brady* materials are not limited
to documents physically in the possession of the USAO; rather, these obligations extend to
materials in the possession of other agencies with which the USAO has conducted a joint
investigation.  *See United States v. Raniere*, 384 F. Supp. 3d 282, 325 (E.D.N.Y. 2019) (stating
that "[w]here the [United States Attorney's Office] conducts a 'joint investigation' with another
state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to
reviewing the materials in the possession of that other agency for Brady evidence" (alterations in
original) (quoting *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012))); *United
States v. Connolly*, 16 Cr. 370 (CM), 2017 WL 945934, at *4 (S.D.N.Y. Mar. 2, 2017) (stating
that, "[w]ith regard to Rule 16 . . . '[t]he inquiry is not whether the United States Attorney's

Office physically possesses the discovery material; the inquiry is the extent to which there was a "joint investigation" with another agency'" (quoting *Upton*, 856 F. Supp. at 750)); *see also Upton*, 856 F. Supp. at 750 ("The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989))).  "In the words of Judge Weinfeld, any argument that the Government's duty does not extend so far merely because another agency, not the USAO, is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.'"  *Gupta*, 848 F. Supp. 2d at 493 (quoting *United States v. Shakur*, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)).

As to the existence of a joint investigation, "[t]he key to the analysis . . . is the level of involvement between the United States Attorney's Office and the other agenc[y]."  *Connolly*, 2017 WL 945934, at *4 (quoting *Upton*, 856 F. Supp. at 750); *see id.* (stating that discovery obligations extend to documents "in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team" (quoting *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 n.3 (S.D.N.Y. 2006))).  Notably, "a 'joint investigation' . . . does not require a coterminous investigation."  *Gupta*, 848 F. Supp. 2d at 495 (rejecting government argument that there was no joint investigation because "the SEC began its administrative investigation well before the Government began its criminal investigation").  And, "it is enough that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions."  *Id.* at 494; *see id.* at 492 ("That separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense; but that they can then

17

disclaim such cooperation to avoid their respective discovery obligations makes no sense at all.").  Courts conducting the "fact-specific" joint investigation inquiry have considered, among other things, whether another agency provides the USAO with documents obtained through that agency's investigative efforts.  *United States v. Martoma*, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (internal quotation marks omitted) (considering in finding joint investigation between USAO and SEC that "[t]he SEC . . . provided the USAO with documents it obtained during its investigation").

### B.     The USAO and NCUA Conducted a Joint Investigation

Here, it is clear from the Indictment and the discovery produced by the government to date that the USAO's investigation of this matter has been conducted jointly with the NCUA.

The Indictment, when compared to the NCUA Notice of Charges, readily demonstrates that the USAO and NCUA have largely been investigating the same sets of facts, pertaining to the same alleged misconduct.  Specifically, Counts Two through Four of the NCUA Notice of Charges mirror the First Bribery Scheme alleged in the Indictment against Mr. Kaufman and Mr. Georgiton, *see* Ex. C ¶¶ 26–66; Ind. ¶¶ 7–25; and Count One mirrors the Second Bribery Scheme alleged in the Indictment against Mr. Kaufman, *see* Ex. C ¶¶ 19–25; Ind. ¶¶ 26–32.

Moreover, the discovery produced by the government shows not only that this investigation was conducted jointly, but that the USAO relied to a remarkable extent on the NCUA's fact-finding efforts in that joint investigation.  Of the discovery provided by the USAO to date, approximately 60% – totaling nearly 150,000 documents (and more than 250,000 prior to de-duplication by a vendor retained by defense counsel) – consists of documents gathered by the NCUA.  These documents include nearly 120,000 documents from an NCUA file, and an entire computer hard drive apparently belonging to Mr. Kaufman collected by the NCUA, which

contains nearly 28,000 documents.  Meanwhile, the evidence gathered by the USAO through grand jury subpoenas consists primarily of a myriad of bank records and non-content records relating to Mr. Kaufman's personal email address.  Unsurprisingly then, when the USAO has responded to questions from counsel for Mr. Georgiton pertaining to documents produced and deficiencies in the production, it has done so in consultation with and reliance on the NCUA. While the NCUA's fact-finding appears to have begun a couple of years prior to the USAO's involvement, that temporal difference is of no moment to the joint investigation analysis.  *See Gupta*, 848 F. Supp. 2d at 495.  Rather, what matters is that the fact-finding by the USAO has demonstrably been conducted in close coordination with, and, indeed, substantial reliance on, the fact-finding by the NCUA.  *See Martoma*, 990 F. Supp. 2d at 462 (finding joint investigation where USAO and SEC "engaged in joint fact-gathering").

In light of this joint investigation between the USAO and NCUA, the Court should issue an Order directing the USAO to search for, identify, and produce all materials in the NCUA's files to which Mr. Georgiton is entitled under Rule 16 and *Brady* and its progeny.  For example, while the government produced the NCUA deposition transcripts of nine different individuals, the government has not produced any statements, sworn or otherwise, by Melrose loan officers Larry Fisher and Dino Velentzas that allege that the loans at issue were "favorable."  *See* Ind. ¶ 11.  Nor has the government produced any statements, sworn or otherwise, by the Melrose marketing director reflecting his view that the naming rights for the ballroom at issue were not worth the price Melrose paid.  *See id.* ¶ 14.  Presumably, the NCUA is in possession of such statements because they charged Mr. Kaufman with offenses based on the purported statements of at least certain of these individuals.  *See* Ex. C ¶ 52.  In a similar vein, the USAO should be

required to search for and produce the following records, among others, from the NCUA because they would constitute Rule 16 and/or *Brady* material:

    a.   Information pertaining to medallion-related loans made or offered by Melrose or other credit unions to members or potential borrowers during the period charged in the Indictment;

    b.   Reports of examinations and supporting documentation of Melrose conducted by the New York State Department of Financial Services and/or the NCUA during the period charged in the Indictment;

    c.   Records pertaining to Melrose's marketing and advertising budget, expenditures, or contemplated or proposed expenditures during the period charged in the Indictment; and

    d.   Records relating to the NCUA's findings that credit unions other than Melrose violated NCUA rules or regulations, or otherwise engaged in unsafe and unsound business and lending practices during the period charged in the Indictment.

## IV.   THE COURT SHOULD DIRECT THE GOVERNMENT TO FILE A BILL OF PARTICULARS

The Indictment in this case, even considered together with the discovery produced to date, does not sufficiently inform Mr. Georgiton of basic, necessary information concerning the charges against him.  And, while counsel for Mr. Georgiton has attempted to confer with the government concerning the information needed, the parties have been unable to reach a resolution.  Accordingly, if the Court does not dismiss the Indictment, the Court should direct the government to file a bill of particulars in order sufficiently to advise Mr. Georgiton of the acts of which he stands accused.

A.   **Legal Standard**

Federal Rule of Criminal Procedure 7 provides that "[t]he court may direct the government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  A bill of particulars serves to "enabl[e] [a] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007) (second alteration in original) (quoting *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988)); *see* CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 130 (4th ed. 2019) (stating that one of functions of bill of particulars is "to give the defendant notice of the essential facts supporting the crimes alleged in the indictment").

As a general matter "no bill of particulars is required" where "the information sought by defendant is provided in the indictment or in some acceptable alternate form."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  Nonetheless, "[t]he Second Circuit has cautioned . . . that the prosecution does not fulfill its obligations 'merely by providing mountains of documents to defense counsel who [a]re left unguided' as to the nature of the charges pending."  *United States v. Harding*, 273 F. Supp. 2d 411, 430 (S.D.N.Y. 2003) (quoting *Bortnovsky*, 820 F.2d at 575).  Indeed, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."  *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000); *see United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (directing government to file bill of particulars where defendant "ha[d] been provided with 100,000 pages of discovery" and "in order to adequately understand the nature of the charges against him," absent the information he sought, would "be forced to comb through this veritable mountain of documents"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 571

(S.D.N.Y. 2000) (directing government to file bill of particulars where it had "produced over 200,000 pieces of paper in hundreds of boxes and files").

    **B.**    <u>**A Bill of Particulars is Required for Mr. Georgiton to Adequately Prepare His Defense and Avoid Surprise at Trial**</u>

The gist of the charges against Mr. Georgiton in this matter is that he allegedly provided items of value to Mr. Kaufman intending to influence Mr. Kaufman, through his position at Melrose, to (1) approve favorable loans to a company owned by Mr. Georgiton; and (2) obtain approval from the Melrose Board to purchase naming rights to a ballroom in Astoria, Queens, owned by a company owned by Mr. Georgiton.

Yet, the Indictment fails to identify basic, essential information pertaining to these allegations, specifically:

(1) any "money" and "other things of value" Mr. Georgiton is alleged to have given Mr. Kaufman, in addition to the "free housing," Ind. ¶ 7;

(2) each of the "lavish dinners," *id*. ¶ 7, to which Mr. Kaufman treated Mr. Georgiton, in addition to those identified in Paragraph 21 of the Indictment;

(3) each of the ways in which were the loans at issue "favorable," *id*. ¶¶ 7, 9, 10;

(4) the dates, signors, and essential terms of the loans that were allegedly issued and/or refinanced on favorable terms, *id.* ¶ 7, 9, 10;

(5) the identity of the "company owned by" Mr. Georgiton that was allegedly the borrower for these loans, *id.* ¶ 9, 10;

(6) the provisions of Melrose's loan policy that the loans in question did "not comply" with, *id*. ¶ 11;

(7) the identity of the "Melrose Loan Supervisor" and where, when, to whom, how, and by what means the "Melrose Loan Supervisor" stated that loans were "too favorable" and "did not comply" with Melrose's loan policy, *id*. ¶ 11;

(8) where, when, to whom, how, and by what means Mr. Kaufman "personally" approved the loans "for" Mr. Georgiton, *id*.;

(9) the identity of the "company owned by" Mr. Georgiton (also referred to as the "Georgiton Company") alleged to have owned the ballroom in Astoria, Queens, *id*. ¶ 12;

(10) the identity of the "Marketing Director" and where, when, to whom, how, and by what means the "Marketing Director" stated that the naming rights for the ballroom were only worth $50,000 a year and the "Marketing Director" would have declined to acquire them, *id*. ¶ 14;

(11) the amount, value, and type of shares referred to by "Georgiton's shares at Melrose CU, *id*. ¶ 16;

(12) the participants in the alleged conspiracy charged in Count One, including the names of any unindicted co-conspirators, *id*. ¶ 19; and

(13) all of the overt acts that the government intends to prove at trial, *id*. ¶ 21.

The failure of the government to provide this crucial information is compounded by the voluminous discovery provided to date in this case, consisting of approximately 250,000 documents, not including duplicates, and over 50 GBs of data.  Without the basic information he seeks, Mr. Georgiton will be "forced to comb," without guidance, "through [a] veritable mountain of documents."  *Savin*, 2001 WL 243533, at *3.

In sum, a bill of particulars is required to give Mr. Georgiton adequate notice of the essential facts concerning the charges against him, without which he would be unable to prepare for trial.

## V.   THE COURT SHOULD PERMIT MR. GEORGITON TO FILE ADDITIONAL MOTIONS

Finally, given the volume and timing of discovery in this case, Mr. Georgiton respectfully requests permission to file additional motions, if required, pertaining to the government's ongoing productions and any deficiencies therein.  At the conference before the Court on July 30, 2019, the government represented that it anticipated producing approximately 15 GB of materials, which it expected to be able to produce by August 9.  *See* July 30, 2019 Conf. Tr. at 3, ECF No. 23.  The government has instead produced over 50 GB of discovery to date.  Moreover, while the first such production indeed occurred on August 9, the government has continued subsequently to produce documents, with additional productions on August 23; August 28; September 6; and September 13.  Further, the government has indicated to counsel for Mr. Georgiton that additional discovery materials remain forthcoming, including but not limited to PST files containing voluminous documents previously produced with technical errors, and deposition exhibits and a complete deposition transcript missing from prior productions.  Though mindful of the Court's deadline for pretrial motions, under these circumstances, Mr. Georgiton respectfully requests that he retain the ability to file additional motions concerning this ongoing discovery, as needed.

## CONCLUSION

For the reasons stated herein, Mr. Georgiton respectfully requests that the Court enter an Order: (1) permitting Mr. Georgiton to join co-defendant Alan Kaufman's motions to dismiss Count One of the Indictment and for a bill of particulars, as well as dismissing Count Three of

the Indictment for the reasons substantially set forth in Mr. Kaufman's moving papers;

(2) granting Mr. Georgiton severance from Mr. Kaufman; (3) instructing the government to

search for, identify, and produce Rule 16 and *Brady* materials to which Mr. Georgiton is entitled

in the files of the NCUA; (4) directing the government to file a bill of particulars; and

(5) granting Mr. Georgiton permission to file additional motions, as required, in light of the

government's voluminous and ongoing document productions.

Dated: New York, New York
      October 2, 2019

                                    Respectfully submitted,

By: _____

Paul M. Krieger
Alexandra S. Messiter
KRIEGER KIM & LEWIN LLP
500 Fifth Avenue
34th Floor
New York, New York 10110
Tel.: (212) 390-9550
Paul.Krieger@KKLllp.com
Alexandra.Messiter@KKLllp.com


Arthur Aidala
Michael Jaccarino
AIDALA, BERTUNA & KAMINS
546 5th Avenue
New York, New York 10036
Tel.: (212) 486-0011
Arthur@aidalalaw.com
jaccarino@aidalalaw.com

*Attorneys for Tony Georgiton*